# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

         Plaintiff,

and

ADAM BREAUX,

         Plaintiff-Intervenor,

v.

PRODUCT FABRICATORS, INC.
and M&M MANUFACTURING, INC.,
as successor,

         Defendants.

**MEMORANDUM OF LAW & ORDER**
Civil File No. 11-2071 (MJD/LIB)

---

Jessica A. Palmer-Denig and Nicholas J. Pladson, Equal Employment
Opportunity Commission, Counsel for Plaintiff Equal Employment Opportunity
Commission.

James R. Andreen and Jessica A. Ommen, Erstad & Riemer, PA, Counsel for
Plaintiff-Intervenor Adam Breaux.

Elisa M. Hatlevig, Marlene S. Garvis, and Vicki A. Hruby, Jardine Logan &
O'Brien, PPLP, Counsel for Defendants Product Fabricators, Inc. and M&M
Manufacturing, Inc.

---

# I.    INTRODUCTION

This matter is before the Court on Plaintiff EEOC's Motion for Summary Judgment on Successor Liability [Docket No. 86]; Plaintiff-Intervenor Adam Breaux's Motion for Summary Judgment on Successor Liability [Docket No. 91]; and Defendants Product Fabricators, Inc. and M&M Manufacturing, Inc.'s Motion for Summary Judgment [Docket No. 93]. The Court heard oral argument on December 13, 2012. For the reasons that follow, the Court grants Defendants' motion for summary judgment with respect to the federal claims and declines to exercise jurisdiction over the remaining state law claims.

# II.    BACKGROUND

## A.    Factual Background

### 1.    Adam Breaux's Employment with Product Fabricators, Inc.

Defendant Product Fabricators, Inc. ("PFI") was a Minnesota sheet metal fabrication company formed in 1973 by Michael Murphy, Sr. and two partners. (Pladson Decl., Ex. A, Michael Murphy, Sr. Dep. 24-26.) Michael Murphy, Sr. was the president of PFI for 39 years. (Id. 14.) He was the sole owner of PFI from 1979 through 2010. (Id. 26-27.)

In 1999, PFI hired Michael Murphy, Sr.'s sons, Mark Murphy and Michael Murphy, Jr. (Pladson Decl., Ex. C, Michael Murphy, Jr. Dep. 18-19; Pladson

Decl., Ex. D, Mark Murphy Dep. 23-24.)  In 2000, they were promoted to Co-Plant Manager positions, reporting to Michael Murphy, Sr.  (Michael Murphy, Jr. Dep. 18-20, 70-71; Mark Murphy Dep. 24.)

Plaintiff Adam Breaux began working for PFI in 1997.  (Hruby Decl., Ex. A, Breaux Dep. 38.)  He worked for PFI as a Turret Operator.  (Breaux Dep. 38; Hruby Decl., Ex. B, Michael Murphy, Jr. Dep. 141, 153.)  He quit PFI in March 2000 to take another job.  (Breaux Dep. 38; Michael Murphy, Jr. Dep. 146-47.)

In March 2005, PFI rehired Breaux as a Turret Operator.  (Hruby Decl., Ex. A, Breaux Dep. 41, 87-88, 95-97.)  In July 2005, PFI promoted Breaux to the Lead of Turrets and Tapping, where he supervised employees in the turrets and tapping departments, delegating tasks and also doing the work himself.  (Id. 98-99.)  From November 2007 until Breaux's termination, Michael Murphy, Jr. was his supervisor.  (Breaux Dep. 88.)

### 2.      Anderson Discrimination Charge and EEOC Investigation

In February 2008, former PFI employee Dennis Anderson filed a charge of disability discrimination against PFI.  (Pladson Decl., Ex. 101.)  On June 24, 2008, EEOC investigators visited PFI and interviewed management and other employees, including Breaux, in connection with Anderson's charge.  (Pladson

Decl., Exs. 103-104.)  Breaux had been Anderson's direct supervisor.  (Hruby

Decl., Ex. C, Mark Murphy Dep. 120.)  Mark Murphy testified that, before the

interviews of the non-supervisory employees, the EEOC told him that they were

going to ask whether PFI accommodated people who were injured and general

issues, but would not bring up particular employees and, in particular, would

not bring up Anderson.  (Mark Murphy Dep. 118-19.)

Breaux claims that he did not talk to anyone about his interview.  (Hruby

Decl., Ex. A, Breaux Dep. 129, 158.)  According to Defendants, after each

employee's EEOC interview, Mark Murphy told him that the interview was

confidential, but he wanted to know if any particular employees were brought

up during the interview.  (Mark Murphy Dep. 124-25.)  Each employee said no,

except for Breaux.  (Id. 125.)  Breaux told Mark Murphy that the EEOC

investigator had asked him about Dennis Anderson.  (Id. 125; Hruby Decl., Ex. B,

Michael Murphy, Jr. Dep. 104-05.)  Breaux tried to tell Mark Murphy about more

of the discussion that he had with the EEOC investigator, explaining that he told

the EEOC that Anderson was a bad worker, but Mark Murphy told Breaux not to

divulge any more information about the substance of the conversation.  (Mark

Murphy Dep. 124-25, 127; Michael Murphy, Jr. Dep. 104-5.)  However, PFI

management, including Mark Murphy, already knew Breaux's negative feelings towards Anderson, and Breaux had previously recommended that PFI terminate Anderson's employment.  (Mark Murphy Dep. 127-28.)  In fact, Breaux's interview with the EEOC investigator was favorable to PFI, with Breaux opining that there was no discrimination and that Anderson "wasn't all there" and "wouldn't do the job, slacked off."  (Pladson Decl., Ex. 104.)

### 3. Breaux's Right Shoulder Injury

On September 4, 2008, Breaux reported a workplace injury to his right shoulder from lifting a heavy object.  (Hruby Decl., Ex. B, Michael Murphy, Jr. Dep. 274; Hruby Decl., Ex. H, Ex. 17; Hruby Decl., Ex. A, Breaux Dep. 104-5.)  PFI directed Breaux to go to urgent care.  (Breaux Dep. 106-07.)  Breaux filled out a First Report of Injury and went to urgent care.  (Breaux Dep. 105-06; Hruby Decl., Ex. K.)  PFI submitted the First Report of Injury to its workers' compensation carrier.  (Breaux Dep. 109; Hruby Decl., Ex. E, Carol Murphy Dep. 110.)  Breaux was eventually diagnosed with a right rotator cuff tear and received workers' compensation benefits from September 4, 2008 until September 16, 2010, when he settled that claim.  (Breaux Dep. 111, 154-55, 184.)  PFI never threatened to reduce or discontinue these benefits.  (Id. 155-56.)

Breaux was provided with a copy of his work restrictions, which provided lifting no more than 10 pounds, pulling and pushing no more than 20 pounds, and no overhead lifting. (Hruby Decl., Ex H, Ex. 6.) On September 30, 2008, PFI moved Breaux to a less physically demanding position of South Manufacturing Supervisor, which did not require Breaux to work outside his restrictions. (Hruby Decl., Ex. H, Ex. 113; Breaux Dep. 124-26.) In that supervisor position, Breaux was responsible for partial operations, directing and delegating work, coordinating various departments to ensure that work was performed in a timely manner, submitting maintenance requests, and operating a forklift. (Hruby Decl., Ex. A, Breaux Dep. 118; Hruby Decl., Ex. B, Michael Murphy, Jr. Dep. 213-15.) He supervised approximately six employees. (Breaux Dep. 119-20.)

During the next year, when Breaux requested time off for medical appointments and physical therapy, PFI provided it without issue. (Breaux Dep. 111, 213-14.) Breaux would provide new work restrictions to PFI after his medical appointments. (Id. 103.) Breaux understood that he had an obligation to keep PFI informed of his current physical abilities. (Breaux Dep. 103, 113.) PFI never asked Breaux to work outside of his restrictions. (Breaux Dep. 123-26, 214; Michael Murphy, Jr. Dep. 216.) His supervisor job did not require Breaux to lift

in excess of his work restrictions. (Michael Murphy, Jr. Dep. 216, 294-95; Mark Murphy Dep. 150.) Breaux never told PFI that he was unable to perform any job functions or having difficulties working within his restrictions; nor did he ever request any accommodations for his work-related injury. (Breaux Dep. 123-26, 152; Michael Murphy, Jr. Dep. 203-04, 241, 287-88.) Breaux testified that he had no difficulties performing all aspects of his job. (Breaux Dep. 152.)

During Breaux's May 22, 2009 medical visit, Breaux told his medical provider to reduce his restrictions because he was doing better. (Breaux Dep. 137, 227; Michael Murphy, Jr. Dep. 294; Hruby Decl., Ex. K, Ex. 8.) The medical provider reduced Breaux's restrictions to occasionally carry 30 pounds, push-pull 40 pounds, and occasionally lift overhead 10 pounds. (Hruby Decl., Ex. K, Ex. 8.) The medical provider stated that she would see Breaux in August, before his work restrictions expired, and explained to him that, if he needed more pain relief, he should have surgery. (Id.)

During early or mid-August 2009, Breaux told Michael Murphy, Jr. that he was beginning to experience pain in his left shoulder similar to the pain he felt after his right shoulder injury. (Breaux Dep. 130; Michael Murphy, Jr. Dep. 242-44; Hruby Decl., Ex. 116.) Breaux testified that he further stated that he was tired

of pain in his right shoulder and was going to see his doctor to discuss surgery. (Breaux Dep. 131.) Michael Murphy Jr. testified that Breaux simply complained that he felt pain in his left shoulder; Breaux did not complain about his right shoulder or mention surgery. (Michael Murphy, Jr. Dep. 242-43.) Michael Murphy, Jr. stated that maybe Breaux just slept on it wrong. (Michael Murphy, Jr. Dep. 244.) He said he would check back with him on Monday. (Michael Murphy, Jr. Dep. 244.) Michael Murphy, Jr. claims that he followed up with Breaux a few days later, on Monday morning, and Breaux told him that his left shoulder was "fine" and he "must have slept on it wrong, or something." (Michael Murphy Dep. 244.) Breaux testified that he is not sure exactly what he said, but he thinks that, on that Monday or Tuesday, Michael Murphy, Jr. asked how Breaux's shoulder was and Breaux told him it was "okay." (Breaux Dep. 142.)

Breaux was not formally assessed for rotator cuff surgery until October 2009. (Breaux Dep. 133-34.) He never provided any documentation to PFI stating that he needed a leave of absence for surgery on his right shoulder. (Breaux Dep. 160.) From May 22, 2009 until September 9, 2009, Breaux had no

medical treatment for his shoulder and did not discuss surgery with his doctor. (Breaux Dep. 229.)

Breaux further testified that, around the same time he talked to Michael Murphy, Jr. about his shoulder, he might have asked Mark Murphy about the amount of time he could take off for surgery and recovery. (Breaux Dep. 163-64.) Breaux also may have said that he would find out how much time off he needed from the doctor and probably let Mark Murphy know. (Id. 163.) Mark Murphy said that he did not know how much time Breaux could take off. (Id. 164.) Breaux never followed up with Mark Murphy. (Id.) Breaux does not remember if that conversation occurred or not. (Id. 162-63.)

### 4. Breaux's Job Performance

According to PFI, starting in May or June 2009, Breaux was no longer effectively managing his department. (Michael Murphy, Jr. Dep. 217-18; Mark Murphy Dep. 99, 163-65; Hruby Decl., Ex. D, Michael Murphy, Sr. Dep. 127-30, 170-71.) The untimeliness of Breaux's department slowed down the entire manufacturing process, sometimes resulting in late shipments to customers, and often resulting in having to pay overtime on Fridays to get projects done. (Breaux Dep. 121; Michael Murphy, Jr. Dep. 227-30; 233.) Other departments

complained about Breaux, or his department, on at least a weekly basis beginning in May 2009. (Michael Murphy, Jr. Dep. 221, 224; Mark Murphy Dep. 171-72, 178-82.) Michael Murphy, Jr. asserts that he discussed the problems with Breaux multiple times, probably on a weekly basis. (Michael Murphy, Jr. Dep. 53, 220-21, 227-28, 409.) There is no documentation of these discussions. (Michael Murphy Dep. 28, 310-11.) PFI asserts that, because of its dire financial situation, employee performance reviews were discontinued in 2007. (See, e.g., id. 28.)

PFI also claims that Breaux was unprofessional and moody during the summer of 2009. (Michael Murphy, Jr. Dep. 251; Mark Murphy Dep. 96, 167-68, 277.) During the summer of 2009, PFI began to remove some of Breaux's supervisory responsibilities. (Michael Murphy, Jr. Dep. 235-36, 288; Mark Murphy Dep. 167-68.) By September 1, 2009, although technically still in the supervisor position, Breaux was essentially functioning as Turret Lead. (Michael Murphy, Jr. Dep. 235-37; Michael Murphy, Jr. Aff. ¶¶ 5-7.)

Breaux claims that, at some point – he does not remember when, even generally, it occurred – he asked Mark Murphy if he could have more manpower on his crew, and, in response, Mark Murphy lamented that certain employee's

medical problems were costing PFI money.  (Breaux Dep. 145-46.)  This one-time

statement was never repeated.  (Id.)  Breaux interpreted this statement as a threat

because he told PFI that he was suffering additional medical problems as a result

of his workplace shoulder injury, which would entitle him to workers'

compensation benefits.  (Breaux Decl. ¶ 2.)

PFI claims that it began looking for a new supervisor in July 2009, but it

advertised for a Turret Lead position because it wanted to make sure that any

new hire fit the company before they placed the employee in a management

position.  (Michael Murphy, Jr. Dep. 225-26, 252; Hruby Decl., Ex. O; Michael

Murphy, Jr. Aff. ¶¶ 9-10.)  On August 26, 2009, Craig Baker applied for the

Turret Lead position.  (Michael Murphy, Jr. Aff. ¶ 8.)  Baker visited PFI at the end

of August 2009.  (Hruby Decl., Exs. L, P; Michael Murphy, Jr. Dep. 225-26.)  PFI

claims that it hired him to take over Breaux's responsibilities, but Baker could not

start until September 2.  (Mark Murphy Dep. 191.)  So, PFI decided to wait to

terminate Breaux until Baker could start.  (Id.)

### 5.    Breaux's Termination

On the morning of September 1, 2009, Mark Murphy approached Breaux

and asked him if he had talked about Anderson during the EEOC investigation

because the EEOC was not supposed to bring up Anderson's name.  (Breaux

Dep. 156-57.)  Then Mark Murphy asked Breaux to sign an acknowledgment

Mark Murphy had written stating that the EEOC had spoken to Breaux about

Anderson more than a year earlier.  (Id.)  Mark Murphy claims that he took this

action to complete Breaux's personnel file before PFI fired him that day.  (Mark

Murphy Dep. 202-04; Carol Murphy Dep. 149-50.)  Breaux signed the document,

which provided:

> Adam Breaux was selected to be interview[ed] regarding Dennis
> Anderson.  In the meeting Dennis was the topic of conversation.
> Adam was asked how well he knew Dennis.  He stated years.  Also
> was asked many other questions regarding Dennis.

(Pladson Decl., Ex. 10.)

At about 5:00 p.m. on September 1, 2009, Mark Murphy and Carol Murphy

called Breaux into the office and told him that he was being fired because "it isn't

working out anymore."  (Breaux Dep. 150-53.)  Defendants assert that Mark

Murphy explained that it was "not working out" because Breaux's "department

[wa]s failing." (Mark Murphy Dep. 209-15; Carol Murphy Dep. 146-52.)  Breaux

asked if he was being fired due to his shoulder injury.  (Breaux Dep. 152-53;

Mark Murphy Dep. 209; Carol Murphy Dep. 151.)  Breaux testified that Mark

Murphy replied that he did not know anything about that.  (Breaux Dep. 152.)

Mark Murphy and Carol Murphy testified that they both responded "What's wrong with your shoulder?" or "What injury?" (Mark Murphy Dep. 156, 209; Carol Murphy Dep. 151.)

On September 9, 2009, Breaux saw his medical provider and discussed surgical options for his right shoulder. (Hruby Decl., Ex. K; Breaux Dep. 164, 229.)

### 6. EEOC's Anderson Lawsuit Against PFI

On August 8, 2008, the EEOC notified PFI that reasonable cause existed to believe that Anderson had been discriminated against under the Americans with Disabilities Act ("ADA"). (Pladson Decl., Ex. 105.) The EEOC filed suit against PFI in this Court on August 31, 2009. (Pladson Decl., Ex. 106.) It served PFI with the Complaint on September 9, 2009. (Hruby Decl., Ex. B, Michael Murphy, Jr. Dep. 125-27.)

On September 1, 2009, an article regarding the lawsuit appeared in the Star Tribune. (Pladson Decl., Ex. G, Ex. 107.) PFI avers that it was not aware of the article until September 9, 2009 or later. (See, e.g., Michael Murphy, Jr. Dep. 131.)

The EEOC asserts that, on August 31, 2009, its attorney, Nicholas Pladson, left a message for Michael Murphy, Sr. with a PFI employee saying that the

EEOC had filed a lawsuit against PFI based on Anderson's discrimination claim and asking Michael Murphy, Sr. to call him back or have his attorney do so. ([Docket No. 119] Pladson Decl. ¶¶ 44-45.)

Michael Murphy, Sr. claims that, on September 2, 2009, he received a message from the PFI receptionist that the EEOC had called for him, and the message included Pladson's name and telephone number. (Hruby, Decl., Ex. D, Michael Murphy, Sr. Dep. 187-88; Michael Murphy, Sr. Aff.) On September 2, he called Pladson, but did not speak to him and left a message for Pladson to call him back. (Michael Murphy, Sr. Dep. 187-92; Michael Murphy, Sr. Aff.; Pladson Decl. ¶ 46.)

### 7.    Breaux's Discrimination Charge

Breaux filed a charge of discrimination against PFI in April 2010. (Pladson Decl., Ex. 120.) On January 13, 2011, the EEOC issued a determination of reasonable cause to believe that Breaux had been terminated in violation of the ADA. (Pladson Decl., Ex. 122.)

### 8.    The Selling of PFI

Starting in 2001, PFI's business struggled financially, until, by late summer of 2010, Michael Murphy, Sr. sought to sell PFI's assets to another corporation.

(See, e.g., Pladson Decl., Ex. A, Michael Murphy, Sr. Dep. 32-41, 53-55.) PFI's workforce was reduced from approximately 250 employees in 2000 to approximately 25 employees in 2009. (See Michael Murphy, Sr. Dep. 35-38; Hruby Decl., Ex. B, Michael Murphy, Jr. Dep. 22, 254; Hruby Decl., Ex. C, Mark Murphy Dep. 28.) By September 2010, PFI was insolvent and on the verge of bankruptcy – PFI owed back taxes to the IRS, the IRS was filing liens on PFI property and equipment, PFI's banks were calling their notes, and PFI could not pay its monthly bills. (Hruby Decl., Ex. D, Michael Murphy, Sr. Dep. 38-40, 204; Banks Aff. ¶ 3; Julie Murphy Aff. ¶ 2.)

On October 26, 2010, Defendant M&M Manufacturing, Inc. ("M&M"), a company incorporated by Michael Murphy, Jr. and Mark Murphy to save PFI's manufacturing operations, purchased all of PFI's tangible and intangible assets. (Pladson Decl., Ex. E, M&M Dep. 33, 58-60, 68-76; Pladson Decl., Exs. 145-146.) M&M did not purchase PFI's debts or liabilities. (M&M Dep. 73.)

PFI began winding down after the sale, leasing its workforce to M&M from October 26, 2010, until December 31, 2010. (Michael Murphy, Sr. Dep. 48-49.) After January 1, 2011, PFI's only corporate activity was to file its taxes and formally dissolve, which it did in January 2012. (Michael Murphy, Sr. Dep. 47,

51-52.)  Once PFI dissolved, M&M registered Product Fabricators as a dba and it now does business as Product Fabricators.  (M&M Dep. 184-85.)

### 9. Anderson Settlement

In the fall of 2010, the EEOC, Anderson, and PFI reached a negotiated settlement.  (Pladson Decl., Ex. 147, Proposed Consent Decree.)  The final consent decree was entered on February 14, 2012.  EEOC v. Product Fabricators, Inc., Civil File No. 09-2303 (JNE/LIB) [Docket No. 72].

### B. Procedural History

On July 27, 2011, the EEOC filed a lawsuit in this Court against PFI, alleging that PFI had discriminated against Breaux.  [Docket No. 1]  On September 29, 2011, the EEOC filed an Amended Complaint, adding M&M as a defendant.  [Docket No. 7]  The Amended Complaint alleges no individual counts, but generally asserts:

> This is an action under Title I of the Americans with Disabilities Act of 1990, as amended by the Americans with Disabilities Amendments Act of 2008, and Title I of the Civil Rights Act of 1991 to correct unlawful employment practices on the basis of retaliation and to provide appropriate relief to Adam Breaux, III ("Breaux") who was adversely affected by such practices.  Plaintiff Equal Employment Opportunity Commission ("EEOC" or "Commission") alleges that Product Fabricators, Inc. ("Product Fabricators" or "PFI"), discriminated against Mr. Breaux by terminating him based on their need to provide him with a

reasonable accommodation for his disability in the form of leave, in violation of Section 102(5)(B) of the ADA, 42 U.S.C. § 12112, and because he requested an accommodation for his disability and for his participation as a witness in a prior EEOC investigation, in violation of Section 503 of the ADA, 42 U.S.C. § 12203.

(Am. Compl. at 1-2.)  The EEOC asserts: "In or around August and September of 2009, Defendant Product Fabricators engaged in unlawful employment practices at its facility in Pine City, Minnesota, in violation of Sections 102(5)(B) and 503, 42 U.S.C. §§ 12112 and 12203 of the ADA."  (Am. Compl. ¶ 11.)

The EEOC further alleges that Breaux was terminated

based on his need for leave as a reasonable accommodation and in retaliation for having requested and/or inquired about a reasonable accommodation of leave in or around August of 2009 that would have enabled him to undergo surgery on his shoulder.

and

in retaliation for having participated as a witness in an EEOC investigation of a charge of discrimination filed by former Product Fabricators' employee Dennis Anderson.

(Am. Compl ¶¶ 14-15.)

On December 21, 2011, Breaux intervened in the case, asserting Count One, Disability Discrimination under the Americans with Disabilities Act; Count Two, Retaliatory Discharge (Minnesota Statute § 176.82, subdivision 1); and Count

Three, Refusal to Offer Continued Employment (Minnesota Statute § 176.82, subdivision 2). [Docket No. 30]

The EEOC, joined by Breaux, now moves for summary judgment on the sole issue of M&M's successor liability. Defendants PFI and M&M move for summary judgment as to liability on the discrimination claims.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact. Celotex, 477 U.S. at 323. "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

### B. ADA Discrimination Claim

### 1.    Standard for ADA Discrimination Claim

Under the ADA, an employer may not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  Courts use the McDonnell Douglas burden-shifting analysis to analyze ADA discrimination claims.  Otto v. City of Victoria, 685 F.3d 755, 758 (8th Cir. 2012).  "A plaintiff seeking relief under the ADA must show (1) he is a disabled person as defined by the ADA, (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation, and (3) he suffered an adverse employment action because of his disability."  St. Martin v. City of St. Paul, 680 F.3d 1027, 1032 (8th Cir. 2012) (citation omitted).  "The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employer's actions.  If the employer articulates such a reason, the burden returns to the employee to show the employer's justification is a pretext."  Lors v. Dean, 595 F.3d 831, 834 (8th Cir. 2010) (citations omitted).

### 2. Prima Facie Case Prong One: Whether Breaux Was Disabled

The Americans with Disabilities Act Amendments Act of 2008 ("ADAAA") applies to this case because the allegedly discriminatory conduct, Breaux's termination, occurred after January 1, 2009.  <u>See</u> 42 U.S.C. § 12112.  "Disability" is a "physical or mental impairment that substantially limits one or more major life activities of [an] individual."  42 U.S.C. § 12102(1)(A).  Plaintiffs argue that Breaux is substantially limited in the major life activity of lifting.  Defendants dispute that Breaux was disabled.  The Court need not resolve this dispute because, assuming that Breaux was disabled, his claim fails because he cannot show causation or pretext.

### 3. Prima Facie Prong Two: Whether Breaux Was Otherwise Qualified

"The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  The parties dispute whether Breaux was otherwise qualified.  The Court need not resolve this dispute because, assuming that Breaux was otherwise qualified, his claim fails because he cannot show causation or pretext.

### 4. Prima Facie Prong Three: Whether Breaux Experienced an Adverse Employment Action Because of His Disability

Plaintiffs argue that they can show causation and pretext because Breaux received no formal warning or documentation of his alleged performance issues before he was fired. Plaintiffs point to other employees who did receive formal warnings for misconduct or performance issues. The Court concludes that these other employees were not similarly situated to Breaux. Before 2008, PFI had a human resources professional, Tracy Blazek. (Michael Murphy, Jr. Dep. 68-69, 178-79.) After Blazek left in 2007, Carol Murphy, Michael Murphy, Sr.'s wife, took over human resources duties. (Id.) After that time, PFI's human resources department was not actively involved, rarely documented performance issues, and failed to conduct performance reviews. (Id.) At that time "the focus got changed to trying to keep the doors open and [PFI] couldn't afford to pay anybody and couldn't afford to do much. . . . There wasn't much performance appraisals going on because there was really no money to give." (Id. 178-79.) Thus, before 2008, when PFI was a larger and more financially healthy company, it had a human resources department that enforced a formal discipline system, while after 2007, there was no fully functioning human resources department, so employees disciplined before 2008 were not similarly situated to Breaux for

purposes of a causation or pretext analysis.  Additionally, most of the employees to whom Plaintiffs compare Breaux were not supervisors, so they were not similarly situated for purposes of discipline for performance failure in managing a department.

PFI's treatment of the two remaining comparative employees – supervisors who received formal warnings after 2007 – is insufficient to support Breaux's claim.  One supervisor did receive written warnings in 2008 for using foul language and unprofessional conduct, which is different than Breaux's performance issues in managing his department.  Another supervisor's file has one written documentation of a 2009 verbal warning for being absent without notifying PFI.  Again, this particular, contained incident of misconduct is different than the long-term departmental performance issues in Breaux's department.   This alone is insufficient to show causation or pretext.

Additionally, there is no temporal proximity here.  Breaux claims to have become disabled in September 2008, when he hurt his right shoulder.  PFI promoted him to supervisor after that date, accommodated all of his restrictions and leave requests, and did not terminate his employment until one year later.  His work restrictions in no way interfered with his duties as supervisor.  There is

no evidence of any connection between Breaux's asserted disability and PFI's decision to terminate him one year later. The Court grants summary judgment to Defendants on the ADA discrimination claim.

## C.     ADA Failure to Accommodate Claim

"In a reasonable accommodation case, the 'discrimination' is framed in terms of the failure to fulfill an affirmative duty-the failure to reasonably accommodate the disabled individual's limitations." Peebles v. Potter, 354 F.3d 761, 767 (8th Cir. 2004).

> [I]t is not the employer's discriminatory intent in taking adverse employment action against a disabled individual that matters. Rather, discrimination occurs when the employer fails to abide by a legally imposed duty. The known disability triggers the duty to reasonably accommodate and, if the employer fails to fulfill that duty, we do not care if he was motivated by the disability.

Id. (citation omitted).

The Court applies a modified burden-shifting analysis to reasonable accommodation claims. Fenney v. Dakota, Minn. & E. R.R. Co., 327 F.3d 707, 712 (8th Cir. 2003). A plaintiff must make a facial showing that he has an ADA disability, that he suffered an adverse employment action, and that he is a "qualified individual," with or without reasonable accommodation. Id.

### 1. Whether Breaux Was Disabled

The Court need not resolve the dispute over whether Breaux was disabled because, assuming that Breaux was disabled, his claim fails because no reasonable accommodation was communicated to PFI that was unfulfilled.

### 2. Whether Breaux Was Otherwise Qualified

The Court need not resolve the dispute over whether Breaux was otherwise qualified because, assuming that Breaux was otherwise qualified, his claim fails because no reasonable accommodation was communicated to PFI that was unfulfilled.

### 3. Whether a Reasonable Accommodation Existed and PFI Engaged in the Interactive Process

The plaintiff need only "make a facial showing that a reasonable accommodation is possible." Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 950 (8th Cir. 1999). The burden of production then shifts to the defendant "to show that it is unable to accommodate." Id. "There is no precise test for what constitutes a reasonable accommodation, but an accommodation is unreasonable if it requires the employer to eliminate an essential function of the job." EEOC v. Convergys Customer Mgmt. Group, Inc., 491 F.3d 790, 796 (8th Cir. 2007) (citations omitted).

Here, Breaux agrees that his position as South Manufacturing Supervisor did not require him to work outside his restrictions. He testified that, when he requested time off for medical appointments and physical therapy, PFI provided it without issue. He agreed that his job did not require him to lift in excess of his work restrictions. Breaux never told PFI that he was unable to perform any job functions or having difficulties working within his restrictions; nor did he ever request any accommodations for his work-related injury. Breaux testified that he had no difficulties performing all aspects of his job. However, Plaintiffs claim that Breaux communicated a reasonable accommodation to Michael Murphy, Jr. and Mark Murphy in August 2009: a request for a temporary leave of absence to have and recover from surgery on his right shoulder. See Brannon v. Luco Mop Co., 521 F.3d 843, 849 (8th Cir. 2008) ("[R]egular attendance at work is an essential function of employment. While allowing a medical leave of absence might, in some circumstances, be a reasonable accommodation, [a]n employer is not required by the ADA . . . to provide an unlimited absentee policy.") (citations omitted).

> Our case law has established a shared responsibility between employers and employees to resolve accommodation requests. A disabled employee must initiate the accommodation-seeking process by making his employer aware of the need for an accommodation.

Additionally, the employee must provide relevant details of his disability and, if not obvious, the reason that his disability requires an accommodation.

Once the employer is made aware of the legitimate need for an accommodation, the employer must make a reasonable effort to determine the appropriate accommodation.

Convergys Customer Mgmt. Grp., Inc., 491 F.3d at 795 (citations omitted).

There is no per se liability under the ADA if an employer fails to engage in an interactive process, but the failure of an employer to engage in an interactive process to determine whether reasonable accommodations are possible is prima facie evidence that the employer may be acting in bad faith. To show that an employer failed to participate in the interactive process, an employee must show that: (1) the employer knew of the employee's disability; (2) the employee requested accommodations or assistance; (3) the employer did not in good faith assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

Kallail v. Alliant Energy Corporate Servs., Inc., 691 F.3d 925, 933 (8th Cir. 2012)

(citations omitted).

Plaintiffs argue that PFI knew about Breaux's shoulder condition and that

he had work restrictions stemming from that injury. They claim that Breaux told

Michael Murphy, Jr. and Mark Murphy that he had shoulder pain and needed

time off for surgery but that PFI failed to respond to Breaux's inquiry and then

fired him a few weeks later.  Plaintiffs conclude that PFI failed to engage in the interactive process and a jury could find that it acted in bad faith.

The Court finds that Plaintiffs' theory is completely unsupported by the record.  When Breaux first suffered his shoulder injury, PFI accommodated Breaux by moving him to a less physically demanding position.  Breaux admits that he was capable of performing the South Manufacturing Supervisor position because it was within his restrictions.  Breaux admits that, up until he was fired, PFI accommodated all of his work restrictions and need for time off for medical appointments and physical therapy.  This entire claim is based on his alleged request for a leave of absence for rotator cuff surgery.  A temporary leave of absence can sometimes constitute a reasonable accommodation; however, the record is clear that Breaux did not provide sufficient information to PFI regarding his alleged request for medical leave in August 2009 to trigger liability:

> The predicate requirement triggering the interactive process is the employee's request for the accommodation.  A mere assertion that an accommodation needed is insufficient; the employee must inform the employer of the accommodation needed.

Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1045 (8th Cir. 2005) (citations omitted).

Taking the facts as Breaux alleges, in August 2009, he told Michael Murphy, Jr. that he was going to see his doctor to discuss surgery on his right shoulder and his left shoulder now had pain similar to his right shoulder. A few days later, Michael Murphy, Jr. asked how Breaux's shoulder was and Breaux told him it was "okay." Around this time, Breaux thinks that he may have asked Mark Murphy about how much time he could take off for rotator cuff surgery and recovery and may have said that he would check with his doctor to see how much time he needed and then tell Mark Murphy. Mark Murphy said he did not know how much time Breaux could take off. Breaux is not even sure if the conversation with Mark Murphy occurred or not. Breaux never requested a leave of absence for rotator cuff surgery and never provided any documentation about it to PFI. He never asked for a particular amount of time off, did not definitively know if he was having surgery, and, according to him, told PFI that he would get back to it with details after he talked to his doctor. Breaux does not allege any negative reaction from PFI about time off for the surgery – Breaux did not know how much time he would need, and Mark Murphy said he did not know how long Breaux could take. PFI did not have the relevant details to enable it to engage in the interactive process. There is simply no request for an

accommodation that was not granted. Defendants are entitled to summary

judgment on the ADA failure to accommodate claim.

### D. Federal Retaliation Claim

#### 1. Standard for Retaliation Claim

The ADA provides:

> No person shall discriminate against any individual because such
> individual has opposed any act or practice made unlawful by this
> chapter or because such individual made a charge, testified, assisted,
> or participated in any manner in an investigation, proceeding, or
> hearing under this chapter.

42 U.S.C. § 12203(a).

The McDonnell Douglas burden-shifting framework applies to ADA and

Title VII retaliation claims. Stewart v. Indep. Sch. Dist. No. 196, 481 F.3d 1034,

1042-43 (8th Cir. 2007).

> [T]he initial burden is on the plaintiff to establish a prima facie case,
> consisting of evidence: (1) that he or she engaged in statutorily
> protected activity; (2) an adverse employment action was taken
> against him or her; and (3) a causal connection exists between the
> two events. If the plaintiff establishes a prima facie case, the burden
> then shifts to the defendant to show a non retaliatory reason for the
> adverse employment action. If the defendant can show a legitimate,
> non-retaliatory reason for its actions, the burden returns to the
> plaintiff who is then obliged to present evidence that (1) creates a
> question of fact as to whether [defendant's] reason was pretextual
> and (2) creates a reasonable inference that [defendant] acted in
> retaliation.

Id. at 1043 (citations omitted).

### 2. Retaliation Claim Based on Breaux's Alleged Request for Leave

Plaintiffs assert a federal retaliation claim based on Breaux's August 2009 mention of leave for right shoulder surgery. The parties agree that Breaux suffered an adverse employment action when he was terminated on September 1, 2009. They disagree on whether Breaux engaged in protected activity and whether there is a causal connection. The Court grants summary judgment to Defendants because Breaux did not engage in protected activity.

An employee who, having a good faith belief that accommodation is appropriate, requests a reasonable accommodation engages in a protected activity. Kirkeberg v. Canadian Pac. Ry., 619 F.3d 898, 908 (8th Cir. 2010). Even "[a]n individual who is adjudged not to be a qualified individual with a disability may still pursue a retaliation claim under the ADA as long as [he] had a good faith belief that [his] requested accommodation was appropriate." Id. at 907 (citation omitted).

Breaux admits that PFI had always previously provided him with all the time off that he needed for medical appointments and he believed that PFI was concerned that he was following his restrictions. (See Hruby Decl., Ex. A, Breaux

Dep. 111, 150, 213-14.)  Thus, this claim is premised on the allegation that PFI

fired Breaux in retaliation for Breaux engaging in the protected activity of

requesting an ADA accommodation – time off for rotator cuff surgery – in good

faith.  As discussed above, there is no evidence that Breaux actually requested an

ADA accommodation.  His mention of possibly needing time off was vague and

speculative – he never requested any particular time off or actually planned a

surgery – and PFI had always accommodated his requests for leave for medical

reasons when actually made.  Breaux's argument that PFI ignored his request for

time off is belied by his own testimony that 1) he is not even sure if the

conversation with Mark Murphy occurred; 2) if the conversation did occur,

Breaux stated that Breaux would get back to Mark Murphy with the amount of

time he needed to take off after his doctor's appointment, so the ball was in

Breaux's court; and 3) Breaux never asked for time off from Michael Murphy, Jr.,

but rather, simply informed him that he thought he would go to the doctor to

discuss getting surgery because of the pain, and Breaux testified that Michael

Murphy, Jr. did follow up on that conversation days later to ask how Breaux's

left shoulder felt and Breaux responded that his shoulder was "okay" and made

no mention of his right shoulder.  There is simply no basis for a reasonable

factfinder to find that Breaux engaged in protected activity. Defendants are entitled to summary judgment on the ADA retaliation claim based on Breaux's request for leave.

### 3. Retaliation Claim Based on Breaux's Interview with the EEOC

The Court grants summary judgment on the retaliation claim based on Breaux's interview with the EEOC because no causal connection exists.

#### a) Timing

Defendants admit that Breaux engaged in protected activity when he was interviewed by an EEOC investigator on June 24, 2008 regarding the Anderson ADA claim and that he suffered an adverse action when he was fired on September 1, 2009. However, the time period between Breaux's interview in June 2008 and his termination more than one year later is too long a time period to support a causal connection. See, e.g., Stewart v. Indep. Sch. Dist. No. 196, 481 F.3d 1034, 1044 (8th Cir. 2007).

Plaintiffs argue that there is sufficient evidence of causation because the EEOC filed the Anderson lawsuit against PFI on August 31, 2009; there was a newspaper article on the lawsuit on September 1, 2009; on September 1, PFI required Breaux to acknowledge his participation in the EEOC investigation; and

that same day he was fired. Plaintiffs claim that PFI resurrected the causal link between Breaux's protected EEOC interview, in June 2008, and his firing, in September 2009, when Mark Murphy made Breaux sign the statement regarding his participation in the Anderson investigation a few hours before firing him. They theorize that, although Defendants knew of Breaux's EEOC interview for more than a year, it was only when PFI was actually sued that it might have thought that Breaux's statement to the EEOC could have exposed PFI to liability.

The parties dispute whether PFI had knowledge of the EEOC's filing of the Anderson lawsuit before PFI terminated Breaux's employment, given that the EEOC did not serve PFI until September 9, 2009, after Breaux's September 1 firing. The Court holds that, even if PFI did have knowledge that the EEOC had filed the Anderson lawsuit before it fired Breaux, the record cannot support a causal connection.

The record is undisputed that, in June 2008, PFI knew that Breaux had engaged in that protected activity. PFI terminated Breaux more than one year after it knew he had engaged in protected activity. This is simply too far in time to support a causal connection. Plaintiffs' assertion that, when PFI learned of the lawsuit, it presumed that Breaux must have made statements against PFI in the

June 2008 interview is speculative. PFI had no reason to think that Breaux's interview would not be favorable to it because Breaux had recommended that PFI terminate Anderson and had frequently complained about Anderson's performance. (See Hruby Dec., Ex. C, Mark Murphy Dep. 70; Hruby Decl., Ex. B, Michael Murphy, Jr. Dep. 84-85.) (And, in fact, Breaux's interview with the EEOC was favorable to PFI.) Also, after Breaux's interview, PFI learned, in August 2008, that the EEOC had found reasonable cause to believe that PFI had discriminated against Anderson. This was more than one year before PFI terminated Breaux. Assuming that PFI did receive knowledge of the EEOC lawsuit just before it terminated Breaux, no reasonable jury could find that this knowledge would have prompted PFI to suddenly retaliate against Breaux for an interview it had known about for over a year and it had every reason to believe was favorable to PFI, more than one year after PFI already knew that the EEOC had made its probable cause determination against PFI. Moreover, the Court notes that PFI did not terminate the other PFI employees who were interviewed during the EEOC investigation. (Hruby Decl., Ex. C, Mark Murphy Dep. 290-91.)

**b)  Significance of Written Acknowledgment**

The Court further rejects Plaintiffs' attempt to glean causation from PFI's September 1, 2009, request that Breaux execute an acknowledgement that the EEOC had questioned him about Anderson. It is undisputed that, since June 2008, PFI had known that the EEOC had questioned Breaux about Anderson. The content of the acknowledgment itself supports PFI's uncontradicted claim that PFI wanted to complete its records concerning Mark Murphy's concerns about the Anderson investigation before it terminated Breaux. Specifically, the EEOC had promised not to ask PFI employees about Anderson, so PFI wanted a written record that the EEOC had breached that promise.

Overall, Plaintiffs cannot establish a prima facie case of causation. Summary judgment is granted on the federal retaliation claim.

### E. Workers' Compensation Claims

In his Complaint, Breaux alleges Count Two, Retaliatory Discharge (Minnesota Statute 176.82, subdivision 1); and Count Three, Refusal to Offer Continued Employment (Minnesota Statute 176.82, subdivision 2). The EEOC does not allege any violations of Minnesota state law. There are no remaining federal claims in this lawsuit. Breaux and both Defendants are citizens of Minnesota. There is no basis for diversity jurisdiction.

"A federal district court has the discretionary power to decline jurisdiction where it has 'dismissed all claims over which it has original jurisdiction.'" Johnson v. City of Shorewood, Minn., 360 F.3d 810, 819 (8th Cir. 2004) (quoting 28 U.S.C. § 1367(c)(3)). "The Supreme Court has noted that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.'" Id. (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)).

> [A] federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims. When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction . . . .

Carnegie-Mellon Univ., 484 U.S. at 350 (footnote and citations omitted).

The Court concludes that dismissal, without prejudice, of Breaux's workers' compensation is appropriate in this case. The basis for federal jurisdiction has been eliminated before trial, and the EEOC is no longer a party to this case. Should Breaux decide to refile his state claims in state court, a

Minnesota state court will be best suited to decide Minnesota workers' compensation-related claims, and this Court has made no decision on the merits of the remaining state law claims.

### F.    Successor Liability

The EEOC moved for summary judgment on the sole issue of M&M's successor liability under federal successor liability law.  Breaux joined in the EEOC's motion, but made no separate argument regarding successor liability under Minnesota law.  The Court interprets Plaintiffs' motions to be regarding successor liability only on the federal claims, leaving the question regarding successor liability on the state law claims open.  Because the Court granted summary judgment to Defendants on all federal claims, Plaintiffs' motion is moot.  Therefore, the Court denies Plaintiffs' motion.

Accordingly, based upon the files, records, and proceedings herein**, IT IS HEREBY ORDERED**:

1.    Plaintiff EEOC's Motion for Summary Judgment on Successor Liability [Docket No. 86] is **DENIED AS MOOT**.

2.    Plaintiff-Intervenor Adam Breaux's Motion for Summary Judgment on Successor Liability [Docket No. 91] is **DENIED AS MOOT**.

3.    Defendants Product Fabricators, Inc. and M&M
      Manufacturing, Inc.'s Motion for Summary Judgment [Docket
      No. 93] is **GRANTED** as follows:

      a.    The EEOC's Complaint against Defendants is
            **DISMISSED WITH PREJUDICE** in its entirety;

      b.    The following count in Adam Breaux's Complaint is
            **DISMISSED WITH PREJUDICE**: Count One,
            Disability Discrimination under the Americans with
            Disabilities Act; and

      c.    The following counts in Adam Breaux's Complaint are
            **DISMISSED WITHOUT PREJUDICE FOR LACK OF
            SUBJECT MATTER JURISDICTION**: Count Two,
            Retaliatory Discharge (Minnesota Statute 176.82,
            subdivision 1); and Count Three, Refusal to Offer
            Continued Employment (Minnesota Statute 176.82,
            subdivision 2).

4.    Defendants Objection to the Magistrate's November 7, 2012 Order
      [Docket No. 138] is **DENIED AS MOOT**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  February 18, 2013          s/ Michael J. Davis
                                   Michael J. Davis
                                   Chief Judge
                                   United States District Court